Received AUG 03 2007
JAMES BONINI, Clerk
CINCINNATI, OHIO
1:40 P.M.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES EX REL.** | : |
| **DEBORAH HAUGER, M.D.,** | : |
| 10 Beechcrest Ln | : **Case No.:** 1:07-CV-631 |
| Cincinnati, Ohio 45206 | : |
| | : |
| Relator, | : |
| | : |
| **BRINGING THIS ACTION ON BEHALF** | : **Judge:** Barrett |
| **OF THE UNITED STATES OF** | : |
| **AMERICA,** | : |
| | : |
| c/o Honorable Gregory G. Lockhart | : **Date Received:** 8/3/2007 |
| United States Attorney | : |
| 221 East Fourth Street, Suite 400 | : |
| Cincinnati, OH 45202 | : |
| | : **Time Received:** 1:40 P.M. |
| and | : |
| | : |
| c/o Honorable Alberto Gonzales | : |
| Attorney General of the United States | : **COMPLAINT** |
| Department of Justice | : |
| 10th & Constitution Avenues, N.W. | : |
| Washington, D.C. 20530 | : **FILED UNDER SEAL PURSUANT TO** |
| | : **31 U.S.C. § 3730(B)(2)** |
| **Plaintiffs,** | : |
| **vs.** | : **INSTRUCTIONS TO THE CLERK:** |
| | : **THIS COMPLAINT IS FILED UNDER** |
| **THE HEALTH ALLIANCE OF GREATER** | : **SEAL. MAINTAIN UNDER SEAL UNTIL** |
| **CINCINNATI** | : **INSTRUCTED OTHERWISE BY COURT** |
| Registered agent: | : **ORDER.** |
| Ct Corporation System | : |
| 36 East Seventh St, Suite 2400 | : |
| Cincinnati, Ohio 45202 | : |
| | : |
| and | : |
| | : |
| **THE FORT HAMILTON HOSPITAL,** | : |
| Registered agent: | : |
| Heather Sanderson Lewis | : |
| 6 South Second Street, 6th floor | : |
| Hamilton, Ohio 45011 | : |

and                             :

**The University Hospital, Inc.**   :
Registered agent:            :
Ct Corporation System     :
36 East Seventh Street      :
Suite 2400                    :
Cincinnati, Ohio 45202     :
                                    :
and                             :

**University Internal Medicine**   :
**Associates, Inc.**            :
Registered agent:            :
Andrew Botschner        :
222 Piedmont St.           :
Ste. 1200                     :
Cincinnati, OH 45219       :
                                    :
                     **Defendants.**    :

## JURISDICTION AND VENUE

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising out of false claims and records presented by Defendants to the United States. This action arises under the provisions of Title 31 U.S.C. Section 3729, *et seq.*, popularly known as the False Claims Act ("FCA"), which provides that the United States District Courts shall have exclusive jurisdiction.

2.      The FCA claims are based upon Defendants' submission of false and fraudulent patient claims and hospital cost reports to the United States in order to obtain payments for various healthcare services. These false claims and false statements were part of Defendants' unlawful scheme to obtain business, kickbacks, and illegal remuneration from physicians in exchange for patient referrals.

3. Section 3732(a) of the FCA provides that, "Any action under section 3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." The acts complained of herein occurred in Cincinnati, Ohio, within this judicial district.

## PARTIES

4. *Qui tam* relator Deborah Hauger, M.D. ("Relator"), is a citizen and resident of the State of Ohio, and brings this action on behalf of the United States of America.

5. As required under the FCA, 31 U.S.C. § 3730(a)(2), Relator provided to the Attorney General of the United States and to the United States Attorney for the Southern District of Ohio, simultaneous with the filing of the original complaint, a statement of all material evidence and information related to the complaint.

6. Defendant the Health Alliance of Greater Cincinnati ("Health Alliance") is an Ohio corporation conducting business in the State of Ohio. The Health Alliance was formed in 1995 as a merger of the operations of The Christ Hospital and The University Hospital.

7. The Health Alliance has grown since that time to become Greater Cincinnati's largest health system and includes both University Hospital and Fort Hamilton Hospital as well as other member hospitals. The Health Alliance manages and operates the largest health care system in Southwestern Ohio and Northern Kentucky.

8. Defendant Fort Hamilton Hospital is an Ohio corporation with its principal place of business located at 630 Eaton Ave in Hamilton County, Ohio. Founded in

-3-

1929, the hospital has grown to occupy a 350,000 square foot facility that services over two hundred patient beds and has over 1,200 employees. Fort Hamilton Hospital joined the Health Alliance in 1998.

9. Defendant The University Hospital, Inc. ("University Hospital") is an Ohio corporation with its principal place of business located at 234 Goodman Street in Hamilton County, Ohio. University Hospital became one of the founding members of the Health Alliance in 1994.

10. Defendant University Internal Medicine Associates, Inc. ("UIMA") is an Ohio corporation with its principal place of business located in Hamilton County, Ohio. UIMA is a private corporation through which faculty at the University of Cincinnati College of Medicine provide primary and consultative care.

11. Defendants the Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA devised a complex scheme of patient referrals made in exchange for kickbacks and other valuable remuneration that benefited Defendants financially but violated Federal law and compromised patient care.

## APPLICABLE LAW AND REGULATIONS

### A.  The False Claims Act

12. The False Claims Act (FCA) provides, in pertinent part, that:

> (a) Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government;. . . or (7) knowingly makes, uses, or causes to be made or used, a

-4-

false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,

* * *

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the
act of that person . . . .

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

B.      **The Anti-Kickback Statute**

13.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

14.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for Federally-funded medical services, including services provided under the Medicare, Medicaid, and (as of January 1, 1997) TRICARE programs.  In pertinent part, the statute states:

(b)     Illegal remuneration

(1)     whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind –

(A)     in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(2)     whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –

(A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)     to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

42 U.S.C. § 1320a-7b(b).  Violation of the statute can also subject the perpetrator to exclusion from participation in Federal health care programs and, effective August 6, 1997, civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid.  42 U.S.C. § 1320a-7(b)(7) and 42 U.S.C. § 1320a-7a(a)(7).

**C.     The Medicare Program**

15.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare Program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A.  Part A of the Medicare Program authorizes payment for institutional care, including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4. Most hospitals, including all of the Health Alliance's hospitals, and Fort Hamilton Hospital and University Hospital in particular, derive a substantial portion of their revenue from the Medicare Program.

16.     The Department of Health and Human Services ("HHS") is responsible for the administration and supervision of the Medicare Program.  The Centers for Medicare & Medicaid Services ("CMS"), formerly HCFA, is an agency of HHS and is directly responsible for the administration of the Medicare Program.

17.     Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services.  Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program. However, Medicare does not prospectively

contract with hospitals to provide particular services for particular patients. Any benefits derived from those services are derived solely by the patients and not by Medicare or the United States.

18.     As detailed below, the Health Alliance, University Hospital, Fort Hamilton Hospital, and UIMA submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

19.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and auditing cost reports.

20.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a CMS Form UB-92 (and prior to 1992, on a HCFA Form UB-82).

21.     As a prerequisite to payment by Medicare, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the Hospital Cost Report. Hospital Cost Reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

22.     After the end of each hospital's fiscal year, the hospital files its Hospital Cost Report with the fiscal intermediary, stating the amount of reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Hence, Medicare relies upon the Hospital Cost

-8-

Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

23. The Health Alliance hospitals, and, in particular, University Hospital and Fort Hamilton Hospital, were required to submit Hospital Cost Reports to their fiscal intermediaries at all times relevant to this complaint.

24. Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s/UB-82s) during the course of the fiscal year. On the Hospital Cost Report, this Medicare liability for inpatient services is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Program or the amount due the provider.

25. Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the Hospital Cost Reports and financial representations made by the Health Alliance's hospitals, specifically, University Hospital and Fort Hamilton Hospital, to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to Hospital Cost Reports previously submitted by a provider if any overpayments have been made. 42 C.F.R. § 413.64(f).

26. Every Hospital Cost Report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

27.     On each Certification, the responsible provider official was required to certify, in pertinent part:

> **[T]o the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.**
> **...**
> **I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.**
> **...**
> **Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under Federal law.   Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.**

Form CMS-2552-92.

28.     Through the CMS Form 2552 certification, the provider certified that the services provided in the cost report were not infected by a kickback.

29.     The Health Alliance, University Hospital, Fort Hamilton Hospital and UIMA are familiar with the laws and regulations governing the Medicare Program, including requirements relating to the completion of cost reports.

30.     A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports) to its fiscal intermediary. 42 U.S.C. § 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

Case: 1:07-cv-00631-SAS-SKB Doc #: 5 Filed: 08/06/07 Page: 12 of 43
Case: 1:07-cv-00631-SAS-SKB Doc #: 5 Filed: 08/06/07 Page: 12 of 43
PAGEID #: 13

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

31.     Beginning in 2007, the Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA submitted or caused to be submitted Hospital Cost Reports that falsely represented compliance with Medicare regulations and laws, including the Anti-Kickback Statute.

32.     These misrepresentations were material to the decision of the government to pay for services.

33.     In light of the foregoing, each CMS Form UB-92 (formerly HCFA Form UB-82) submitted or caused to be submitted by the Health Alliance, University Hospital, Fort Hamilton Hospital, and UIMA under Medicare was a false claim.

34.     In addition to the hospital fees billed by hospitals, physicians also bill for their services provided to Medicare patients.  Physicians and physician groups submit form CMS-1500 (formerly HCFA-1500) for this purpose.

35.     The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

36.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare program, and that the have

complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

37. The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA have submitted or caused to be submitted CMS-1500 forms for their Medicare patients even though they knew that they have not complied with applicable regulations and laws governing Medicare because they have violated the Anti-Kickback Statute.

38. The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA have been paid, or have caused other individual physicians to be paid for these false claims.

39. The Health Alliance's, Fort Hamilton Hospital's, University Hospital's, and UIMA's misrepresentations were material to the decision of the government to pay for the services.

## D.    **The Medicaid Program**

40. Medicaid is a joint Federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The Federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

41. The Federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for Federal funding, which is called Federal financial participation (FFP). 42 U.S.C. §§ 1396, *et seq.*

42. Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

43.     In many states, provider hospitals participating in the Medicaid program file annual cost reports with the state's Medicaid agency, or its intermediary, in a protocol similar to that governing the submission of Medicare cost reports.

44.     In some states, provider hospitals participating in the Medicaid program file a copy of their Medicare cost report with the Medicaid program, which is then used by Medicaid or its intermediaries to calculate Medicaid reimbursement.  In other states, provider hospitals file a separate Medicaid cost report.

45.     Providers incorporate the same type of financial data in their Medicaid cost reports as contained in their Medicare cost reports, and include data concerning the number of Medicaid patient days at a given facility.

46.     Typically, each state requiring the submission of a Medicaid cost report also requires an authorized agent of the provider to expressly certify that the information and data on the cost report is true and correct.

47.     Individual Medicaid programs use the Medicaid patient data in the cost report to determine the reimbursement to which the facility is entitled.   The facility receives a proportion of its costs equal to the proportion of Medicaid patients in the facility.

48.     Where a provider submits the Medicare cost report with false or incorrect data or information to Medicaid, this necessarily causes the submission of false or incorrect data or information to the state Medicaid program, and the false certification on the Medicare cost report necessarily causes a false certification to Medicaid as well.

-13-

49.     Where a provider submits a Medicaid cost report containing the same false or incorrect information from the Medicare cost report, false statements and false claims for reimbursement are made to Medicaid.

50.     The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA sought reimbursement from designated state Medicaid programs for the time period pertinent to this complaint.     The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA submitted or caused to be submitted Hospital Cost Reports that falsely represented compliance with Medicaid regulations and laws, including the Anti-Kickback Statute.     These misrepresentations were material to the decision of the government to pay for services.     CMS relied upon the certifications of Defendants in paying for their services.

51.     In light of the foregoing, each CMS Form UB-92/UB-82 submitted or caused to be submitted by The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA under Medicaid was a false claim.

52.     In addition to the hospital fees billed by hospitals, physicians also bill for their services provided to Medicaid patients.     Physicians and physician groups submit form CMS-1500 (formerly HCFA-1500) for this purpose.

53.     The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

54.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicaid program, and that they had

-14-

complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

55. The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA have submitted or caused to be submitted CMS-1500 forms for their Medicaid patients even though they knew that they have not complied with applicable regulations and laws governing Medicaid because they have violated the Anti-Kickback Statute.

56. The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA have been paid for these false claims or caused these false claims to be paid or approved.

57. The Health Alliance's, Fort Hamilton Hospital's, University Hospital's, and UIMA's misrepresentations were material to the decision of the government to pay for the services.

### E.     The TRICARE/CHAMPUS Program

58. At all times relevant to this complaint, the Health Alliance hospitals and, specifically, Fort Hamilton Hospital and University Hospital were enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), now known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS").

59. TRICARE/CHAMPUS is a Federally-funded program that provides medical benefits, including hospital services, to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer; (b) the unmarried spouses and children of deceased service members; and (c) retirees. Hospital services at non-military facilities

-15-

are sometimes provided for active duty members of the armed forces, as well. 10 U.S.C. §§ 1971-1104; 32 C.F.R. § 199.4(a).

60. In addition to individual patient costs, TRICARE/CHAMPUS reimburses hospitals for two types of costs based on the Medicare cost report: capital costs and direct medical education costs. 32 C.F.R. § 199.6.

61. A facility seeking reimbursement from TRICARE/CHAMPUS for these costs is required to submit a TRICARE/CHAMPUS form, "Request for Reimbursement of CHAMPUS Capital and Direct Medical Education Costs" ("Request for Reimbursement") in which the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relates to these two cost areas and which is derived from the Medicare cost report for that facility.

62. This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report."

63. Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE/CHAMPUS or its fiscal intermediary applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patients in the facility.

64. The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA submitted or caused to be submitted Requests for Reimbursement to TRICARE/CHAMPUS that were based on their Medicare cost reports. Whenever Defendants' Medicare cost reports contained falsely inflated or incorrect data or information from which Defendants derived their Requests for Reimbursement

submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were also false.

65.     Whenever Defendants' Requests for Reimbursement were false due to falsity in their Medicare cost reports, Defendants falsely certified that the information contained in their Requests for Reimbursement was "<u>accurate</u> and based upon the hospital's Medicare cost report."  (Emphasis added.)

66.     The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA sought reimbursement from designated state Medicaid programs for the time period pertinent to this complaint.  Defendants submitted or caused to be submitted Hospital Cost Reports that falsely represented compliance with Medicare regulations and laws, including the Anti-Kickback Statute.

67.     The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA knew that false claims contained in their Medicare cost reports would affect TRICARE/CHAMPUS reimbursement as well.  CMS relied upon the certifications of Defendants in paying for their services.

68.     These misrepresentations were material to the decision of the government to pay for services.

69.     In light of the foregoing, each CMS Form UB-92/UB-82 submitted or caused to be submitted by the Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA under TRICARE/CHAMPUS was a false claim.

70.     In addition to the hospital fees billed by hospitals, physicians also bill for their services provided to TRICARE/CHAMPUS patients.  Physicians and physician groups submit form CMS-1500 (formerly HCFA-1500) for this purpose.

71.     The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

72.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the TRICARE/CHAMPUS program, and that the have complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

73.     The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA have submitted or caused CMS-1500 forms to be submitted for TRICARE/CHAMPUS patients even though they knew that they have not complied with applicable regulations and laws governing TRICARE/CHAMPUS because they have violated the Anti-Kickback Statute.

74.     The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA have been paid for these false claims.

75.     The Health Alliance's, Fort Hamilton Hospital's, University Hospital's, and UIMA's misrepresentations were material to the decision of the government to pay for the services.

## **FACTUAL ALLEGATIONS**

**A.      Background Regarding Fort Hamilton Hospital, University Hospital, and The Health Alliance**

76.     In 1998, James Kingsbury, then the Senior Vice President of Fort Hamilton Hospital, successfully negotiated Fort Hamilton Hospital's addition to the Health Alliance.

-18-

Case: 0:71-cv-00630-SSB-SS Doc #: Filed: 08/06/07 Page: 1 of 43
Case 1:07-cv-00630-SSB Doc #: 5 Filed: 08/06/07 Page: 12 of 43 PAGEID #: 21
PAGEID #: 21

77.    In 2004, Kingsbury was named the Executive Director of University Hospital and his successor, Lynn Oswald, was appointed Senior Vice President of Fort Hamilton Hospital. Both hospitals are members of the Health Alliance.

78.    The Christ Hospital and St. Luke Hospitals have recently withdrawn from the Health Alliance. This withdrawal had an adverse financial impact on the Health Alliance and, accordingly, its member hospitals, including Fort Hamilton Hospital. The remaining Health Alliance hospitals were ordered to post a $4.8 million bond to cover the departing hospitals' legal fees and were denied a stay of this order on June 21, 2007. The break-up of the Health Alliance could force its member hospitals to pay a portion of its $350,000,000 debt.

79.    In addition to the financial concerns shared by all Health Alliance members, Fort Hamilton Hospital has suffered from declining revenues and inadequate patient volume.

80.    As a member of the Health Alliance, University Hospital shares Fort Hamilton Hospital's financial concerns regarding the partial break-up of the Health Alliance. In addition, University Hospital's 2007 revenues have declined markedly from prior years. As of June 2007, University Hospital projected a $5,000,000 deficit for the fiscal year – an $18,000,000 decline from 2006. On or about June 1, 2007, University Hospital Executive Director – and former Fort Hamilton Hospital Senior Vice President – James Kingsbury, attributed much of this decline to a lower volume of surgical procedures.

81.    In 2005, Lynn Oswald hired Goodman and Associates, Inc. ("Goodman and Associates"), a hospital consulting firm, to develop a plan to improve Fort Hamilton

-19-

Case: 1:07-cv-00630-SAS-SEB Doc #: 5 Filed: 08/06/07 Page: 20 of 43
Case: 1:07-cv-00630-SAS-SEB Doc #: 5 Filed: 08/06/07 Page: 20 of 43
PAGEID #: 22

Hospital's financial outlook. Goodman and Associates recommended generating revenue at Fort Hamilton Hospital by performing interventional cardiology procedures such as angioplasties and cardiac catheterizations. At the time, Fort Hamilton Hospital's cardiology practice was limited to non-invasive diagnostic procedures (*e.g.*, echocardiograms, electrocardiograms, stress tests, and diagnostic catheterizations). These non-invasive procedures are much less lucrative than interventional procedures.

82. Under Ohio law, a hospital is precluded from performing interventional cardiology procedures unless the hospital has on-site cardiac surgery capability. Ohio Admin. Code § 3701-84-30 (2003). This is because complications that may occur during interventional procedures, such as a perforated coronary artery during angioplasty, can result in mortality without immediate cardiac surgery.

83. As of August 1, 2007, Fort Hamilton Hospital does not have on-site cardiac surgery.

**B.     The C-Port Clinical Trial**

84. The only way that Fort Hamilton Hospital could practice interventional cardiology without cardiac surgery capability was by participating in the Atlantic Cardiovascular Patient Outcomes Research Team Elective Angioplasty Study ("C-Port"), a clinical trial comparing Percutaneous Coronary Intervention ("PCI") outcomes with and without backup cardiac surgery.

85. PCI is a method of treating coronary artery disease. PCI refers to a series of procedures that often begins with determining the location of the obstructed blood vessel with an angiogram. The angiogram is typically followed by balloon angioplasty, which consists of inserting a small catheter tipped with a balloon into the femoral artery,

-20-

threading it through the body until it reaches the heart, and then inserting it into the clogged artery. The balloon is then inflated, thereby opening the artery and flattening plaque against the arterial wall. Angioplasty is often followed by deployment of an intracoronary stent to hold the previously obstructed artery open.

86.    A common alternative to PCI is administration of a thrombolytic drug that attempts to reopen the artery through chemical rather than physical means. PCI is generally more effective than treatment with a thrombolytic agent. However, it poses a risk absent from drug treatment: occasionally, the obstructed coronary artery ruptures or perforates during the procedure. When this happens, immediate cardiac surgery may be required to save the patient's life.

87.    C-Port theorizes that, in areas that lack close proximity to a hospital with cardiac surgery capability, it may be safer to perform interventional procedures than to rely on alternative treatment, even though patients that experience complications during interventional procedures will have to be rapidly transported to a hospital with cardiac surgery capability. The study is based on data suggesting that interventional procedures are more effective than alternative treatment when back-up cardiac surgery is available.

88.    C-Port is an academic study, and was not intended to serve as a revenue generator for struggling hospitals. The Society for Cardiovascular Angiography and Interventions has stressed that developing a PCI program when driven by financial or market gain is "strongly discouraged."

89.    Current guidelines endorsed by the Society for Cardiovascular Angiography and Interventions, the American Heart Association, and the American

-21-

College of Cardiology classify elective PCI without on-site cardiac surgery a Class III indication, meaning that it is considered "not useful/effective and in some cases may be harmful." Circulation 2006; 113:156-75.

90.     Through the C-Port trial, participating hospitals that lack cardiac surgery perform PCI, but only after meeting a series of requirements, including procuring a sponsor hospital that has cardiac surgery to serve as "backup" for surgical complications. In addition, 25 percent of all interventional procedures originating at the participating hospital are referred to the sponsor hospital to provide a control group for the patients receiving care at the participating hospital.

**C.      Defendants Plot to Cure Their Financial Woes Through Illegal Patient Referrals.**

91.     Defendants began to plot their patient referral scheme in 2005, when Lynn Oswald approached UIMA in an effort to obtain cardiology coverage and, therefore, access to the C-Port trial. On December 28, 2005, Relator and Lynn Oswald met with Dr. David Stern, Dean of University of Cincinnati College of Medicine for this purpose.

92.     On March 14, 2007, Lynn Oswald met with Dr. Bradley Britigan, President of UIMA, James Kingsbury, Executive Director of University Hospital, and other UIMA and University Hospital physicians at the Wetherington Golf and Country Club in West Chester, Ohio – Kingsbury's country club. At this meeting, Kingsbury, Britigan, and Oswald brokered a deal whereby Fort Hamilton Hospital, UIMA, and University Hospital would generate revenue for themselves and the Health Alliance through a complex scheme of patient referrals.

93.     Soon after the Wetherington meeting, Fort Hamilton Hospital, through Lynn Oswald, negotiated and entered into an oral agreement with UIMA and University Hospital to provide cardiology coverage for Fort Hamilton Hospital's C-Port interventional cardiology program in exchange for patient referrals.

94.     As part of the scheme, the Health Alliance agreed to provide $3.5 million towards the construction of an interventional cardiology laboratory at Fort Hamilton Hospital.   Dorman Foley, Chief Financial Officer of the Health Alliance, refused to provide these funds to Fort Hamilton Hospital unless it agreed to use a Health Alliance hospital as the sponsor hospital.  This ensured that patient referrals from Fort Hamilton Hospital – and the Federal funds that pay for much of their care – would not be diverted to other area hospitals that are not members of the Health Alliance.

95.     Construction of the new facility, including construction of several new cardiac catheterization laboratories, is scheduled to be completed in September 2007.

**D.     Defendants' Illegal Scheme**

96.     A "facility fee" is a fee charged by the hospital at which medical services are provided that is separate from the physician's charge for the actual service.  The facility fee compensates the hospital for the ancillary services provided to the patient by the hospital, such as nursing services, services of technical personnel, drugs, surgical dressings, supplies, equipment, blood, plasma, administrative services, record keeping, and housekeeping services.

97.     Fort Hamilton Hospital can now charge a facility fee for each interventional procedure performed at the hospital – fees that could not be charged

without inducing UIMA's and University Hospital's participation in the scheme through patient referrals.

98.    Fort Hamilton Hospital now anticipates performing over 200 interventional procedures each year through its agreement with UIMA and University Hospital, and will charge a facility fee for each of those procedures.

99.    Although the precise fee depends upon the specific services provided to an individual patient, facility fees for interventional procedures are typically several thousand dollars.

100.   Fort Hamilton Hospital would not earn any facility fees for interventional procedures from the Federal government without the ability to perform those procedures in the first instance – an ability acquired through its kickback-for-referral agreement with UIMA and University Hospital.

101.   In exchange for the remuneration outlined above, Fort Hamilton Hospital agreed to designate UIMA cardiologists as "Preferred Cardiology Providers." As "Preferred Cardiology Providers," UIMA cardiologists practicing at Fort Hamilton Hospital became the recipient of all unassigned cardiology patients in need of services at Fort Hamilton Hospital.

102.   Under this agreement, unless a patient that arrives at Fort Hamilton Hospital requests a specific cardiologist by name, that patient is assigned to a UIMA cardiologist. The effective result of this agreement is that all new Fort Hamilton Hospital cardiology business goes to UIMA cardiology, and non-UIMA cardiologists that practice at the Fort Hamilton Hospital are precluded from treating these patients.

-24-

103. Numerous interventional cardiologists that are not affiliated with UIMA have privileges at Fort Hamilton Hospital. These cardiologists include Relator. However, since none of these non-UIMA cardiologists are "Preferred Providers" under Forth Hamilton Hospital's patient referral-for-kickback scheme, none receive the unassigned patients that are referred only to UIMA cardiologists.

104. Fort Hamilton Hospital not only refers unassigned patients to UIMA cardiologists pursuant to the Preferred Provider Agreement, but also refers to University Hospital every patient that requires cardiac surgery instead of an interventional procedure. These referrals for patients needing cardiac surgery are even more lucrative than referrals for diagnostic or interventional procedures.

105. The average cardiac surgery procedure generates approximately $100,000 in revenue, and University Hospital will likely perform 100-200 additional cardiac surgery procedures each year due to the stream of referrals from Fort Hamilton Hospital. The Health Alliance and University Hospital will therefore enjoy approximately $10,000,000 to $20,000,000 in additional revenue from these patient referrals.

106. In addition to the steady flow of patient referrals for cardiac surgery, University Hospital cardiology also receives 25% of all patients that enter Fort Hamilton Hospital in need of interventional procedures as a condition of the C-Port trial. These patients are intended to be the control group for the C-Port clinical trial, but are being used by University Hospital as a revenue source and a cure for its budgetary woes.

107. Defendants' referral-for-kickback scheme benefits each Health Alliance member by keeping patients within the Health Alliance and excluding them other area hospitals. Prior to Defendants' scheme, many patients were referred from Fort

-25-

Hamilton Hospital to other area hospitals such as Mercy Hospital Fairfield – a facility with myriad experienced cardiologists and cardiac surgeons that is located only 9 miles away from Fort Hamilton Hospital – for interventional procedures or cardiac surgery. Now, those same patients and the revenue they produce are enjoyed by Fort Hamilton Hospital (facility fees), UIMA (procedure fees for interventional cardiology), University Hospital (procedure fees for cardiac surgery and fees for interventional procedures performed as the C-Port control group), and the Health Alliance (reaping the benefit of increased revenue at both Fort Hamilton Hospital and University Hospital). Other area hospitals that are in a better position to provide optimal care are precluded from providing care to these patients by virtue of this scheme. The diagram below, Figure A, illustrates patient flow from Fort Hamilton Hospital to area hospitals (including Defendants) for interventional procedures and cardiac surgery prior to Defendants' scheme:



Figure A: Patient Flow Prior to Defendants' Scheme

108.    The next diagram, Figure B, shows how Defendants' kickback-for-referral scheme diverts patients and revenue away from other area hospitals and keeps them within the Health Alliance and UIMA.  The revenue from interventional procedures and cardiac surgeries is now enjoyed <u>exclusively</u> by Defendants:

Figure B: Impact of Illegal Patient Referrals



109.   Defendants' illegal scheme was discussed openly at meetings of the Fort Hamilton Hospital Board of Trustees and at Medical Executive Committee meetings.

110.   The March 15, 2007 Fort Hamilton Hospital Board of Trustees minutes state that "Ms. Oswald gave an update on the cardiovascular project and reported negotiations are underway with UC physicians." (The terms "UC physicians" and "UC cardiologists" were used to refer to UIMA cardiologists.)   A true and accurate copy of these minutes is attached as Exhibit A.

111.   At the May 2, 2007 Fort Hamilton Hospital board meeting, Matt Turner, Director of Cardiovascular Services, confirmed that the C-Port project was moving forward and merely waiting for approval of Fort Hamilton Hospital's resubmission of its C-Port application to the University Institutional Review Board.   Mr. Turner noted that

-28-

the new catheterization labs were under construction and that interventional procedures were scheduled to begin on June 30, 2007. A true and accurate copy of these meeting minutes is attached as Exhibit B.

112. At the May 11, 2007 Medical Executive Committee meeting, Lynn Oswald disclosed that Fort Hamilton Hospital had entered into a "Preferred Provider Agreement" with UIMA cardiologists. Lynn Oswald said that Fort Hamilton Hospital had to give UIMA cardiologists "preferred cardiology referrals" to make it "worth their while" to come to the hospital. Lynn Oswald commented that this arrangement was necessary to "save the hospital."

113. Relator questioned whether this referral-for-kickback arrangement was legal at the May Medical Executive Committee meeting. Although she later contradicted herself, Lynn Oswald then claimed that she had a legal opinion stating that the arrangement was permissible.

114. On June 27, 2007, Irma Frisch, an EKG technician, following the orders of Mr. Turner, told Relator that she would no longer be supervising stress tests on Wednesdays, as had been the schedule, and that this privilege would be granted exclusively to UIMA cardiologists.

115. On June 28, 2007, Dr. Manitsas told Relator that all noninvasive studies (such as echocardiograms, electrocardiograms, and stress tests) would be given to UIMA cardiologists as part of the agreement to induce them to come to Fort Hamilton Hospital and to "make it worthwhile financially." A true and accurate copy of Relator's notes from this meeting is attached at Exhibit C, and the relevant text appears below:

-29-

*I met with a Manolas in the office and he told me that all of the noblinvasive studies (echo, Etc, stress) would be given to UC as part of the agreement for them to come do open and make it worthwhile financially.*

## E.    Defendants' Scheme Compromises Patient Care.

116.   Prior to Defendants' scheme, patients that entered Fort Hamilton Hospital and needed cardiac surgery were referred to the facility/cardiac surgeon that was geographically closest and best-suited for that patient's needs.  Under the Preferred Provider Agreement, however, patients are referred only to University Hospital.  This artificial patient funneling ensures that all of these patients – and the Federal dollars that pay for their medical services – stay within the Health Alliance system, to the detriment of patient care.

117.   Patient care is particularly compromised in an emergency situation when a patient must be rapidly transported from Fort Hamilton Hospital to an alternate facility to undergo cardiac surgery.  Without Defendants' illegal scheme, that patient would be transported directly to Mercy Hospital Fairfield, a facility that has experienced cardiologists and cardiac surgeons on staff and is located a mere 9 miles away.  Because of the kickback-for-referral arrangement, however, patients that need immediate cardiac surgery must travel 32 miles to University Hospital, quite literally passing another viable cardiac surgery center on the way.  This difference in travel time could cost patients' lives and could exacerbate the harm done to patients fortunate enough to survive an emergency event.

Case: 0:71-cv-00630-SAS-SE Doc #: 5 Filed: 08/06/07 Page: 32 of 43
Case: 1:07-cv-00630-SAS-SE Doc #: 5 Filed: 08/06/07 Page: 32 of 43
PAGEID #: 33

118.    Defendants' illegal scheme also reduces the quality of patient care because UIMA is providing cardiology trainees (students) rather than trained, experienced, board-certified cardiologists – many of whom are available at Fort Hamilton Hospital.    Relator has notified Defendants of her concerns that these inexperienced cardiology trainees could fail to provide adequate care, but Fort Hamilton Hospital has chosen to willfully disregard this concern.

**F.    Defendants Refused to End Their Referral-for-Kickback Scheme When Confronted With its Illegality and Detrimental Impact on Patient Care.**

119.    On June 29, 2007, Relator was told that, beginning July 1, she was no longer authorized to read any electrocardiograms other than those that she ordered personally.  In addition, she had been replaced by UIMA cardiology trainees on the July "cardiologist on call" schedule posted in the ER.  The new schedule included cardiology trainees from UIMA from 6 P.M. to 6 A.M. on Wednesdays, 6 P.M. to 6 A.M. on Fridays, and all day on Saturdays and Sundays.  These times had previously been reserved for Relator and other non-UIMA cardiologists.

120.    Relator was surprised to see UIMA cardiology trainees listed as the "cardiologist on call" because cardiology trainees are, by definition, not cardiologists. Cardiology trainees have not completed their cardiology fellowship and are not board-certified cardiologists.

121.    On July 1, 2007, Relator requested that she and other board-certified non-UIMA cardiologists be included on the on-call schedule.  Dr. Kripal, head of the Fort Hamilton Hospital ER, told her that the schedule was determined by Administration and could not be changed by the ER.

-31-

122.   On July 3, 2007, Relator told Lynn Oswald that she was concerned about the quality of care provided by "cardiologists on call" that were not cardiologists but cardiology trainees, and that were not board-certified or even board-eligible.  Relator was particularly concerned and surprised by this practice because there were numerous experienced cardiologists, including herself, available to perform diagnostic procedures at Fort Hamilton Hospital.

123.   Lynn Oswald responded to Relator's criticisms by stating that the trainees were "physicians" and that this arrangement "is common in many underserved areas in the U.S."   Oswald did not explain why the make-shift arrangement used in an underserved area would justify reliance on inexperienced trainees where – as at Fort Hamilton Hospital – a rich supply of experienced, board-certified cardiologists is available.

124.   Relator asked Lynn Oswald if the Fort Hamilton Hospital staff knew that the "cardiologists" provided by UIMA were not University of Cincinnati faculty, but medical trainees.   Lynn Oswald told Relator that this information had been communicated to staff at the June Medical Executive Committee meeting.

125.   Relator challenged Lynn Oswald's assertion regarding the June Medical Executive Committee meeting, and pointed out that the meeting minutes did not reflect this communication.  Relator also questioned Fort Hamilton Hospital's new practice of assigning the reading of noninvasive tests to UIMA.  A true and accurate copy of the June 8, 2007 Fort Hamilton Hospital Medical Executive Committee meeting minutes is attached as Exhibit D.  Contrary to Lynn Oswald's assertions, the minutes do not reflect

that hospital staff was informed that UIMA would be providing University of Cincinnati cardiology trainees instead of University of Cincinnati faculty.

126. Lynn Oswald's only response was to affirm that the referral of all noninvasive tests was promised to UIMA as part of their Preferred Provider Agreement. A true and accurate copy of Relator's notes from this meeting is attached as Exhibit E, and the relevant text appears below:

> "I also asked her about the reading of the noninvasive tests and she again stated that all of these were promised to the UC Cablers as part of their preferred provider agreement."

127. At the July 13, 2007 Medical Executive Committee meeting, Lynn Oswald confirmed that Fort Hamilton Hospital was paying University of Cincinnati cardiology trainees to perform consultations and diagnostic procedures at Fort Hamilton Hospital, and that Fort Hamilton Hospital was billing for their services. Lynn Oswald also said that the Institutional Review Board was meeting on July 18, 2007, to confirm the University's involvement with Fort Hamilton Hospital in the C-Port trial, and announced that the University Hospital principal investigator would be the cardiologist Dr. Helmy. Lynn Oswald advised the committee members that the C-Port trial would be in effect and that interventional procedures would be performed at Fort Hamilton Hospital by August 1, 2007.

128. Relator voiced alarm over Fort Hamilton Hospital's plans during the July 13, 2007 meeting. She questioned the quality of care that would be provided to patients by cardiology trainees that were neither board-certified nor board-eligible and,

therefore, whether Fort Hamilton Hospital would be meeting the standard of care in Ohio.

129. At the meeting, Relator also said that she believed that the patient referral-for-kickback arrangement that Fort Hamilton Hospital had devised was illegal.

130. In response to Relator's concerns, Lynn Oswald said only that Fort Hamilton Hospital had not entered into a <u>written</u> agreement with UIMA or University Hospital to generate referrals, and that Fort Hamilton Hospital had entered into preferred provider agreements in the past. Lynn Oswald also conceded that she did not have a legal opinion justifying the arrangement, indicating that her prior assurances that she had obtained legal approval for the patient referral scheme were false. Finally, Oswald confirmed that she had promised UIMA cardiologists "guaranteed referrals" in exchange for performing procedures at Fort Hamilton Hospital, and that Relator had been removed from the diagnostic reading panel and from the ER on-call list to facilitate making these "guaranteed referrals."

131. Lynn Oswald ignored the quality of care issues regarding UIMA cardiology trainees that Relator raised at the July 13, 2007 Medical Executive Committee meeting, stating that these are "physicians of 2nd and 3rd year of training and are qualified to do the job."

132. The fact that Fort Hamilton Hospital did not have a legal opinion justifying its patient referral arrangement was confirmed through a July 16, 2007 e-mail from Diane Taylor, Lynn Oswald's executive assistant and a Health Alliance employee. Taylor refused to share the details of the Preferred Provider Agreement between UIMA and Fort Hamilton Hospital with Relator, even though Relator is a member of the Fort

-34-

Hamilton Hospital board of directors. A true and accurate copy of the July 16, 2007 e-mail is attached as Exhibit F, and the relevant text appears below:

Subj:    Re: Board Meetings Notice – July 19, 2007
Date:    7/16/2007 9:05:39 AM Eastern Daylight Time
From:    Diana.Taylor@healthall.com
To:

Cardiology update is on the agenda.

I checked with Lynn regarding the legal opinion regarding the hospital's preferred doctor arrangements and there is no legal opinion. There is just an agreement. Lynn said we do not share agreements with anyone who is not a party to the agreement.

I hope this answers your questions.

Let me know if you need anything further.

133. On July 20, 2007, Lynn Oswald sent an e-mail in response to Relator's criticisms of Fort Hamilton Hospital's patient referral scheme, the allocation of diagnostic test reading to UIMA, and the use of cardiology trainees in place of experienced cardiologists. Incredibly, Oswald affirmed Fort Hamilton Hospital's participation in the patient referral scheme and said that she would "communicate the guidelines that we discussed to the medical executive committee and at the recent board meeting to each of our patient care departments so that there is no question what is expected and what should be done." A true and accurate copy of this e-mail is attached as Exhibit G and an excerpt appears below:

I have refrained thus far from sending out any direction or guidelines to our associates about cardiology referrals because I wanted to make sure that we had finalized these decisions as much as possible. But since this has gotten so confusing, I am now going to communicate the guidelines that we discussed to the medical executive committee and at the recent board meeting to each of our patient care departments so that there is no question what is expected and should be done.

## G.    Defendants Violated the Anti-Kickback Statute and the False Claims Act.

134. As the foregoing demonstrates, The Health Alliance, Fort Hamilton Hospital, University Hospital, and UIMA established an illegal scheme whereby extremely lucrative referrals for diagnostic, interventional and surgical procedures were made to UIMA and University Hospital in exchange for UIMA's performance of

-35-

interventional procedures at Fort Hamilton Hospital under the C-Port trial. Performance of these procedures enabled Fort Hamilton Hospital to charge the Federal government for facility fees. Without inducing UIMA and University Hospital to provide cardiology coverage and cardiac surgery through the patient referral scheme, Fort Hamilton Hospital would not have received this valuable remuneration.

135. Defendants devised this scheme with reckless disregard for its legality, and did so even though Relator openly questioned its legality on numerous occasions.

136. This arrangement is not only illegal but compromises patient care in at least two ways. Patients that suffer a complication during an interventional procedure at Fort Hamilton Hospital could, in many circumstances, receive life-saving cardiac surgery at Mercy Hospital Fairfield, which is located only 9 miles away. Instead, patients in need of emergency care must travel 32 miles to University Hospital to obtain cardiac surgery under Defendants' unlawful agreement.

137. The patient referral scheme also compromises patient care because UIMA is providing cardiology trainees (students) to perform procedures that would otherwise be performed by experienced, board-certified cardiologists. Many seasoned cardiologists are available to provide medical care at Fort Hamilton Hospital but are precluded from doing so because they are not participants in Defendants' illegal scheme.

138. Defendants solicited and accepted illegal remuneration and kickbacks and referred large volumes of patients, including Medicare and Medicaid patients and beneficiaries of other government healthcare programs, to one another in violation of Federal law. Defendants also submitted or caused to be submitted claims to Medicare,

Medicaid, and other government healthcare programs and obtained payments from the United States.  Under the False Claims Act, 31 U.S.C. § 3729(a)(1), such claims were false and/or fraudulent because of Defendants' violations of the Anti-Kickback statute.

139.  Defendants also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making or causing to be made false statements when submitting these claims for payment to Medicare and other government programs.  Defendants falsely certified that the claims and statements were "true" and/or "correct" and as such were entitled to payment.

140.  To conceal their unlawful conduct and avoid refunding payments made on the false claims, Defendants also falsely certified, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7), that the services identified in their annual cost reports were provided in compliance with Federal law, including the prohibitions against kickbacks, referrals, and illegal remuneration to physicians.  The false certifications, made with each annual cost report submitted to the government, were part of Defendants' unlawful scheme to defraud Medicare and other government healthcare programs.

141.  Defendants entered into agreements with certain physicians and each other and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled in violation of 31 U.S.C. § 3729(a)(3) through the Preferred Provider Agreement, through which Fort Hamilton Hospital referred patients to UIMA in exchange for cardiology coverage and the ability to charge facility fees, and by referring patients from Fort Hamilton Hospital to University Hospital for cardiac surgery in exchange for cardiology coverage and the ability to charge facility fees.

142.   Pursuant to the scheme, pattern, and practice described above, Fort Hamilton Hospital, UIMA, University Hospital, and the Health Alliance obtained or provided illegal remuneration, inducements, and kickbacks from physicians, submitted false and fraudulent claims, and fraudulently obtained payments from the United States in exchange for referrals to physicians in violation of the Anti-Kickback Statute and the False Claims Act.

143.   Each and every Form CMS-1500, CMS-2552, and UB-92 (and each of their former incarnations) submitted or caused to be submitted by Defendants since the inception of this scheme was a false claim, statement, or record.

144.   The United States was damaged because of the acts of Defendants in submitting, causing to be submitted, or conspiring to submit false claims, statements and records in that it paid Defendants for items and services for which they were not entitled to reimbursement.

145.   Defendants profited unlawfully from the payment of illegal remuneration, and kickbacks to physicians.

## FIRST CAUSE OF ACTION
(False Claims Act: Presentation of False Claims)
(31 U.S.C. § 3729(a)(1))

146.   Relator repeats and realleges the preceding allegations as if fully set forth herein.

147.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to University

-38-

Case: 1:07-cv-00063-SSB-SKB Doc #: 6 Filed: 03/06/07 Page: 1 of 43 PAGEID #: 323
Case: 1:07-cv-00063-SSB-SKB Doc #: 6 Filed: 03/06/07 Page: 32 of 43
PAGEID #: 41

Hospital cardiology in exchange for kickbacks and/or illegal remuneration in violation of the Anti-Kickback Statute.

148. By virtue of the false or fraudulent claims made by the Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

**SECOND CAUSE OF ACTION**
(False Claims Act: Making or Using False Record or Statement
to Cause Claim to be Paid)
(31 U.S.C. § 3729(a)(2))

149. Relator repeats and realleges the preceding allegations as if fully set forth herein.

150. Defendants knowingly made, used, or caused to be made or used, false records or statements – *i.e.*, the false certifications and representations made or caused to be made by Defendants when initially submitting the false claims for interim payments and the false certifications made or caused to be made by Defendants in submitting the cost reports – to get false or fraudulent claims paid or approved by the United States.

151. By virtue of the false records or false statements made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### THIRD CAUSE OF ACTION
(False Claims Act; Making or Using False Record or Statement to
Avoid an Obligation to Refund)
(31 U.S.C. § 3729(a)(7))

152.    Relator repeats and realleges the preceding allegations as if fully set forth herein.

153.    Defendants knowingly made, used or caused to be made or used false records or false statements – *i.e.*, the false certifications made or caused to be made by defendants in submitting the cost reports – to conceal, avoid or decrease an obligation to pay or transmit money or property to the United States.

154.    By virtue of the false records or false statements made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### FOURTH CAUSE OF ACTION
(False Claims Act; Conspiring to Submit False Claims)
(31 U.S.C. § 3729(a)(3))

155.    Relator repeats and realleges the preceding allegations as if fully set forth herein.

156.    Defendants entered into agreements with certain physicians and each other and conspired to defraud the United States by submitting false or fraudulent claims for reimbursement from the United States for monies to which they were not entitled, in violation of 31 U.S.C. § 3729(a)(3).

157.    As part of schemes and agreements to obtain reimbursement from the United States in violation of Federal laws, Defendants conspired to provide kickbacks to physicians in violation of the Anti-Kickback Statute, and to cause the United States to

-40-

pay claims for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services when they were not so provided.

158. By virtue of Defendants' conspiracy to defraud the United States, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### PRAYER FOR RELIEF

Relator, on behalf of the United States Government, prays:

a) That this Court enter judgment against Defendants in an amount equal to three times the amount of actual damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of $5,500 to $11,000 for each action in violation of 31 U.S.C. § 3729, and the costs of this action, with interest, including the costs of the United States for its expenses related to this action;

b) That the Relator be awarded all costs incurred, including reasonable attorneys' fees;

c) That, in the event that the United States Government takes over this action, the Relator be awarded an amount for bringing this action of at least 15% but not more than 25% of the proceeds of the action or settlement of the claim;

d) That, in the event the United States does not proceed with this action, the Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of the action or the settlement;

e)      That the Relator be awarded prejudgment interest;

f)      That a trial by jury be held on all issues; and

g)      That the United States Government and Relator receive all relief,

both in law and in equity, to which they may reasonably appear entitled.


Respectfully submitted,

Glenn V. Whitaker   (0018169)
VORYS, SATER, SEYMOUR AND PEASE LLP
Suite 2000, Atrium Two
221 E. Fourth Street
Cincinnati, Ohio  45202
Telephone: (513) 723-4000
Facsimile: (513) 723-4056
gvwhitaker@vssp.com

Trial Attorney for Relator Relator, M.D.


**Of Counsel:**

Victor A. Walton, Jr. (0055241)
Michael J. Bronson  (0074448)
VORYS, SATER, SEYMOUR AND PEASE LLP
Suite 2000, Atrium Two
221 E. Fourth Street
Cincinnati, Ohio  45202
Telephone: (513) 723-4000
Facsimile: (513) 723-4056
vawalton@vssp.com
mjbronson@vssp.com

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable herein.

_____
Glenn V. Whitaker

-43-